IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 0:11-cv-62476-WILLIAMS

RYAN H. FOLEY,

       Plaintiff,

vs.

MORGAN STANLEY SMITH
BARNEY, LLC, a Delaware limited
Liability company,

       Defendant.

MORGAN STANLEY SMITH
BARNEY, LLC, and
MORGAN STANLEY SMITH BARNEY
FA NOTES HOLDINGS, LLC,

       Counter Plaintiffs,

vs.

RYAN H. FOLEY,

       Counter Defendant.

_____/

## ORDER ON SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendants Morgan Stanley Smith Barney,

LLC and Morgan Stanley Smith Barney FA Notes Holdings, LLC's (together, "Morgan

Stanley") Motion for Summary Judgment [D.E. 118], Plaintiff Ryan Foley's ("Foley")

Response in opposition [D.E. 123] and Morgan Stanley's Reply [D.E. 126]. Having

reviewed the pleadings and the record, the Motion is GRANTED. Morgan Stanley shall

submit a proposed final judgment to Chambers by March 11, 2013.

1

## I. Background

Morgan Stanley removed this action from state court on November 18, 2011.

[D.E. 1]. On February 24, 2012, Foley filed his Second Amended Complaint. [D.E. 23].

On September 25, 2012, Foley filed his Third Amended Complaint (the "Complaint") and

dismissed Counts III-VI of his Second Amended Complaint with prejudice. [D.E. 99,

100]. The operative Complaint alleges discrimination under the Americans with

Disabilities Act ("ADA") (Count I) and discrimination under the Florida Civil Rights Act of

1992 ("FCRA") (Count 2). [D.E. 99]. Morgan Stanley filed an Answer and

Counterclaim, which alleges breach of a promissory note and unjust enrichment. [D.E.

104].

Foley began working for Morgan Stanley as a financial advisor on October 24,

2008. [D.E. 118 ¶ 1].[1] It is undisputed that he was an at-will employee.[2]  *Id.*  Foley's

Employment Agreement, which he admits that he read (*id.* ¶ 3), stated

> Nothing in this Agreement is a promise of employment for a fixed term.  Your
> employment by Morgan Stanley is strictly at-will and may be terminated by either
> party, for any reason or for no reason, at any time, with or without notice, and
> with or without cause.  As used in this Agreement, "termination" includes (1)
> voluntary or involuntary resignation, (2) retirement, (3) release due to a reduction
> in force or closing of a branch office, or (4) discharge by Morgan Stanley.
> Employment Agreement ¶ 1 [D.E. 118-1].

The Employment Agreement specified that Foley "would have access to information that

has been acquired by expenditures of time, effort and money by Morgan Stanley, and

which is valuable and proprietary information to Morgan Stanley" *Id.* ¶ 2.1.  Such

information specifically included "computer software or hardware for use in computer or

---

[1] Citations to paragraphs in D.E. 118 reference the Statement of Undisputed Facts portion of that document.

[2]  Plaintiff argues that his at-will status is irrelevant.

2

word processing equipment," which were classified as "Trade Secrets." *Id.* Foley explicitly acknowledged that Morgan Stanley "takes all reasonable measures to maintain [the Trade Secret's] confidentiality and secrecy." [D.E. 118 ¶ 5]. Accordingly, Foley had access to confidential records and information during the course of his employment, (*id.* ¶ 6), and agreed that he would not "remove Trade Secrets or other Company Records from the premises of Morgan Stanley in either original or copied form, except in the ordinary course of conducting business for, and subject to approval by, Morgan Stanley." *Id.* ¶ 7.

Furthermore, Foley received and read Morgan Stanley's Employment Handbook and Code of Conduct. *Id.* ¶¶ 9-11. The Handbook required that each employee "protect the assets of the Firm," including its technology, software and business equipment. *Id.* ¶ 10. As Foley knew, the Code of Conduct allowed for his termination for any violation of the Handbook. *Id.* ¶ 11. He admitted that the Code required him to tell Morgan Stanley if: "(a) [Foley] believed he had violated any law, regulation or MSSB policy or if (b) [Foley] became aware of any client information being lost or stolen, including loss or theft of any portable devices." *Id.* Foley also concedes that removing a computer without permission was a violation of Morgan Stanley's policies and procedures. *Id.* ¶ 13.

On November 4, 2010, Foley removed the central processing unit (including the hard drive) of his office computer and took it from the premises. *Id.* ¶ 17; [D.E. 122 ¶ 17]. He took the computer to the home of a friend, who was not a Morgan Stanley employee, and left it there for six days. [D.E. 118 ¶ 22]. He does not deny that he

removed the unit, that he did not have permission to remove the computer,[3] that the computer was Morgan Stanley's property and was considered to be a Trade Secret, and that such removal constituted a violation of Morgan Stanley's policies. *Id.* ¶¶ 18-21.

On November 5, 2010, Foley returned to Morgan Stanley and took a colleague's computer from that colleague's cubicle, which he placed in his office. Id. ¶ 22. Michelle Queen, Morgan Stanley's Complex Risk Officer, found out that Foley had taken his colleague's computer and tried to speak to him about it. *Id.* ¶ 24. Foley would not speak with her and left the office (he testified that, other than recalling that Queen asked him questions about the computer, he does not remember any other details about the conversation). Id. ¶ 24; [D.E. 122 ¶ 24].

Upon further investigation, Morgan Stanley realized that Foley's computer was not on premises; security camera footage showed him leaving the building on November 4, 2010, with his hard drive. [D.E. 118 ¶ 25, 27]. The situation was reported to Kevin McCarty, who was responsible for the hiring and firing of all personnel in the four Miami area Morgan Stanley offices. *Id.* ¶ 28. Thereafter, various Morgan Stanley employees attempted to contact Foley on November 5, 2010, to ascertain the location of the computer. *Id.* ¶ 29. At least one employee spoke to Foley that day and testified that Foley stated he did not have the computer and did not know where it was. *Id.* ¶ 31. Foley does not recall the conversations but disputes that he was intentionally untruthful during the conversation. [D.E. 122 ¶ 31]. Moreover, he does not dispute that the missing computer presented serious security concerns for Morgan Stanley because of Morgan Stanley's access to confidential and proprietary information. [D.E. 118 ¶ 26].

---

[3] Foley alleges that at the time he removed the computer, he was hallucinating and believed that he had the permission of his two assistants to remove the computer. [D.E. 122 ¶ 19].

McCarty testified that the decision to terminate Foley was made on November 5, 2010. *Id.* ¶ 34. He stated that Morgan Stanley wanted to recover the computer from Foley before informing Foley of his termination because he believed the firm was more likely to retrieve the computer before Foley knew he was being fired. *Id.* ¶ 35. Consequently, Foley was put on paid administrative leave beginning November 5, 2010, while the investigation into the computer's whereabouts continued. *Id.* ¶ 37.

On the morning of November 10, 2010, Foley spoke again with Morgan Stanley representatives and told them that he did not take the computer. *Id.* ¶ 38. He testified during his deposition that he did not tell firm representatives where the computer was during that conversation because he did not remember taking it. [D.E. 122 ¶ 38]. Foley stated that later that same day, once he remembered where the computer was, he informed Morgan Stanley and went to his friend's home to pick up the computer. *Id.* ¶ 39. Morgan Stanley recovered the computer from Foley's home that afternoon. [D.E. 118 ¶ 40]. He was terminated later that same day. *Id.* ¶ 41. Foley admits that the reason he was terminated was because of the computer incident. *Id.* ¶ 43.

Foley alleges that he took the computer when he was in the midst of a psychotic episode (a manifestation of his bipolar disorder) and thought Morgan Stanley was spying on him through his computer. *See* [D.E. 122 ¶¶ 65-66]. He acknowledges that he never disclosed his disorder to Morgan Stanley before this incident and never requested an accommodation pursuant to the ADA prior to November 9, 2010, despite being given the opportunity to "self-identify" as disabled pursuant to Morgan Stanley's Non-Discrimination Policy. [D.E. 118 ¶¶ 16, 49-50]. The first time Morgan Stanley purportedly learned of Plaintiff's condition was on November 7, 2010, when Foley's wife,

Kati, spoke with Rafael Alvarez, another Morgan Stanley Financial Advisor. *Id.* ¶ 47. Alvarez then emailed McCarty to tell him Plaintiff had been seen at South Miami Hospital and was being transferred to Hialeah Psychiatric Hospital for further evaluation. *Id.* ¶ 47. The email does not specifically mention bipolar disorder, and Morgan Stanley's position is that Kati Foley did not disclose the existence of that specific condition during her phone call. However, Ms. Foley asserts that she told Alvarez that Foley suffered from the disorder during the conversation. *Id.* ¶ 48. In any event, Foley's treating physician, Dr. Emilio Mantero-Atienza, testified that while it was possible Foley would have another manic phase, his bipolar disorder is in "full remission." [D.E. 122 ¶ 54].

Foley alleges that the decision to terminate him was not made until *after* McCarty received the email from Alvarez about his condition on November 7, 2010. *Id.* ¶ 67. The only documentary evidence on the subject is in the form of three emails between Morgan Stanley human resources personnel. The first, at 4:49 PM on Friday, November 5, 2010, placed Foley on paid administrative leave. [D.E. 122-7]. The second, at 3:37 PM on November 10, 2010, stated "FYI-we are planning to terminate Ryan Foley this afternoon." [D.E. 122-8]. The final email said "Ryan called and said he has the computer. Evan is having someone drive to his house to pick it up. I believe we will still terminate Ryan, but it may be later this week and not this afternoon." *Id.* Foley testified that Alvarez told him if he returned the computer, Morgan Stanley would reinstate him to his position. *Id.* ¶ 72.

As part of his employment package, Foley and Morgan Stanley executed a Promissory Note, under which Morgan Stanley loaned Foley $2.2 million dollars at a

yearly interest rate of 3.25%. [D.E. 118 ¶ 56]. The Note allowed that "Morgan Stanley shall declare this Note immediately due and payable, without notice or demand, if . . . the Employee's employment with Morgan Stanley terminates voluntarily or is terminated by Morgan Stanley for any reason whatsoever prior to the due date of any payment under this Note . . . ." Promissory Note p. 1 [D.E. 118-2]. Foley also signed a Promissory Note Acknowledgement Form, which stated that he understood that:

> This loan does not constitute a bonus, and if I voluntarily terminate or am terminated for any reason at all outstanding principal and interest under the Note will become immediately due and payable to Morgan Stanley except as otherwise provided for in the Note. [D.E. 118 ¶ 58].

Foley made two principal payments under the note, each in the amount of $244,444.44. *Id.* ¶ 59. The note became immediately due and payable on November 10, 2010. *Id.* ¶ 60. Morgan Stanley made a demand on Plaintiff for repayment of the note on December 14, 2010. *Id.* ¶ 61. Foley does not dispute the validity of the debt or the amount Morgan Stanley has calculated that he owes, but has not paid the balance due and states he does not intend to do so. *Id.* ¶¶ 62-63.

## II. Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or others materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III. Analysis

The ADA provides that "[n]o covered entity[4] shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a). "[D]isability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims," and therefore this Court will "consider both claims together." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007).

"Under the controlling law in this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims." *Id.* (citation and alteration omitted). "Under that framework the plaintiff must first establish a prima facie case of discrimination . . . . Once the plaintiff has made a prima facie case, a rebuttable

---

[4]   Morgan Stanley does not dispute that it is a "covered entity." *See* 42 U.S.C. § 12111(2) (defining "covered entity" to include an "employer"); *id.* § 12111(5)(A) (defining "employer").

8

presumption arises that the employer has acted illegally.  The employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action.  If it does so, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons are a pretext for discrimination."  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (citations omitted).

## A. Prima facie case

To show a prima facie case of discrimination under the ADA and FCRA, a plaintiff must demonstrate: (1) the existence of a disability or handicap; (2) that he is qualified (with or without a reasonable accommodation) to perform his essential job functions; and (3) that the defendant took an adverse employment action against the plaintiff because of his disability.  *Id.* (citing *Gordon v. E.L. Hamm & Assoc., Inc.*, 100 F.3d 907, 910 (11th Cir. 1996)).  A plaintiff must prove each element of this test by a preponderance of the evidence.  *Id.*  The plaintiff must also show that the "employer had either actual or constructive knowledge of the disability or considered the employee to be disabled."  *Gordon*, 100 F.3d at 910.

### 1. Disability

Under the ADA, "[t]he term 'disability' means, with respect to an individual—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."  42 U.S.C. § 12102(1).  Morgan Stanley does not dispute that Foley's diagnosis of bipolar disorder constitutes a disability.  Thus, he meets the first prong of the prima facie case.

## 2. Qualified

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  "The term *essential functions* means the fundamental job duties of the employment position," but "does not include the marginal functions of the position."  29 C.F.R. § 1630.2(n)(1); *Earle v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). "Evidence of whether a particular function is essential includes . . . [t]he employer's judgment as to which functions are essential."  29 C.F.R. § 1630.2(n)(3)(i).  In deciding whether a particular duty is an essential function, the court undertakes a factual inquiry.  *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258 (11th Cir. 2001).  "An employer must provide reasonable accommodations for employees with known disabilities unless such accommodations would result in undue hardship to the employer."  *Ray v. Kroger Co.*, 264 F.Supp.2d 1221, 1227 (S.D. Ga. 2003) (citing *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000)).  "An employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position."  *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002).

In determining what functions Morgan Stanley deemed essential, an examination of the Employee Handbook is appropriate and reveals the following:

> The Firm's information assets are the property of the Firm and are to be used for Firm business only.  Each employee has an obligation to protect the assets of the Firm, including its cash and securities, premises, technology, proprietary and confidential information, intellectual property (e.g., software, business plans, non-public financial information, ideas for new products and services, and customer lists), capital, business equipment, facilities and its reputation. [D.E. 118 ¶ 10].

10

Here, Foley's requested accommodation is that Morgan Stanley forgive the wrongful taking of the computer and reinstate him to his position. He argues that his treating physician has testified that his disorder is in "full remission" and does not anticipate any relapses. Therefore, he claims that he is once again "qualified" to perform his job. Nonetheless, Plaintiff admits that his taking of the computer was a violation of firm policy and that Morgan Stanley considers its security to be of utmost importance. Morgan Stanley counters that Foley is not a "qualified individual" and his requested accommodation is not reasonable. First, Morgan Stanley asserts Foley is not qualified because one of his essential job functions is protecting the assets of the company and its highly sensitive and proprietary information, which Foley failed to do in this instance. Second, Morgan Stanley points out that Foley's doctor testified he could not state with certainty that Foley would not have a relapse of his disorder. Finally, Morgan Stanley argues that overlooking Foley's actions in this case would cause it an undue hardship.

The Court concludes, as admitted by Foley and argued by Morgan Stanley, that Morgan Stanley's security policy is an integral part of its business and not "superfluous to its proper operation." *Hall v. Wal-Mart Assocs., Inc.*, 373 F.Supp.2d 1267, 1273 (M. D. Ala. 2005) (quoting *Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 154 (1st Cir. 1998)). Foley acknowledges that he breached this essential policy by removing his computer from the premises and leaving it with a friend, who was not an employee of Morgan Stanley. Foley's failure to follow company policy in this instance rendered him unable to meet the essential requirements of his job and maintain Morgan Stanley's security. Foley addresses this argument by quoting the general proposition that "where

11

a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred." *Crapp v. City of Miami Beach Police Dep't*, 242 F.3d 1017, 1020 (11th Cir. 2001) (citation omitted); [D.E. 123 at 10]. While this proposition may be a correct statement of the law, it fails to address the salient facts of this case. Indeed, there is no doubt that Foley, a long time financial advisor, had the technical skills and experience required for his position. Rather, the issue is whether his more recent unprofessional conduct rendered him otherwise unqualified. *See Williams*, 303 F.3d at 1291 (quoting with approval *Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1, 14 (D.D.C. 2000) for the notion that "technical skills and experience are not the only essential requirements of a job and stability and the ability to interact with co-workers constitutes an essential function") (alterations omitted). Foley argues that cases where courts have found that unprofessional conduct disqualifies an individual from ADA protections were based upon facts and records of long-term, ongoing misconduct rather than the one-off instance here. The Court disagrees. There is no requirement that an employer tolerate unprofessional behavior for a certain period before it is entitled to discharge an employee. Moreover, in cases like *Hall*, employees were discharged for less egregious behaviors than the instant case where Foley took trade secrets from Morgan Stanley and lied about their whereabouts for five days.

And there is no dispute that Morgan Stanley did not know of his disability at the time he took the computer and violated the company policy. According to the Eleventh Circuit, "the defendant's duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v.*

12

*Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 2007). The employee must make a request for accommodation while "on the job," not after the fact. *Howard v. Steris Corp.*, --- F.Supp.2d ---, 2012 WL 3561956 at \*16 (M.D. Ala. 2012) (citing *Jackson v. Boise Cascade Corp.*, 941 F.Supp. 1122 (S.D. Ala. 1996)).

Furthermore, requiring Morgan Stanley to tolerate this breach and the resulting dishonesty, even if Foley did not intend it, would be an unreasonable accommodation. See *Hall*, 373 F.Supp.2d at 1272 (finding that requiring Wal-Mart to "tolera[te] [plaintiff's] dishonesty-would require Wal-Mart to sustain an undue hardship," even where plaintiff argued his mental retardation prevented him from forming the requisite intent to steal). Due to the nature of Morgan Stanley's business and its access to proprietary information, it would be unreasonable to require Morgan Stanley to tolerate an employee removing trade secrets in direct violation of company policy and leaving them with an outsider. Therefore, Foley is not a "qualified individual" and cannot meet this prong of the prima facie test; summary judgment in favor of Morgan Stanley is appropriate.

## 3. Causation

The Court finds that Foley also fails to satisfy the third prong of the prima facie analysis, which requires that he show that Morgan Stanley discriminated against him "on the basis" of or "because of" a perceived disability. To do so, he need not show that the perceived disability was the "sole" factor, but rather that it was simply "a factor that made a difference in the outcome." *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1073-77 (11th Cir. 1996); *accord Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999). On the one hand, though the evidence is scant, Foley has raised

a question as to when the termination decision was made—before or after Morgan Stanley learned of his disability. While Morgan Stanley's representatives testified that they decided to fire him on November 5, 2010, the firm's emails demonstrate that Foley was placed on paid administrative leave on November 5, 2010. Foley was not terminated until November 10, 2010, after Foley alleges Morgan Stanley found out about his disability. Nonetheless, Foley admits that he was terminated because he took the computer in violation of company policy. [D.E. 118 ¶ 43; D.E. 122 ¶ 43]. The Court finds instructive the following analysis offered by Judge Posner in a case where a terminated employee suffered from mental illness:

> There is no evidence that Palmer was fired because of her mental illness. She was fired because she threatened to kill another employee. The cause of the threat was, we may assume, her mental illness . . . . But if an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act. *Palmer v. Circuit Court of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997) (Posner, J.)

"The law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability." *Ray*, 264 F.Supp.2d at 1228 (collecting cases and quoting *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999)). The Equal Employment Opportunity Commission's stance on this issue is also clear. In its Primer on the ADA, the Commission states that employers "do not have to . . . excuse violations of conduct rules necessary for the operation of your business. Example: You do not have to tolerate violence, threats of violence, theft or destruction of property, even if the employee claims that a disability caused the misconduct." The Americans with Disabilities        Act:        A        Primer        for        Small        Business,

www.eeoc.gov/publications/adahandbook.cfm. Foley's citations to Tenth Circuit case law (and failure to cite to pertinent Eleventh Circuit precedent) for the proposition that disability-related behavior is protected is unavailing, particularly upon a close reading of the cases. The Tenth Circuit has held that an "employer must tolerate eccentric or unusual conduct caused by the employee's mental disability, *so long as the employee can satisfactorily perform the essential functions of his job.*" *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1088 (10th Cir. 1997) (emphasis added). The Court has already determined that Foley could not perform the essential aspect of his job; Foley was terminated not because of his disability but because he violated firm policy. Therefore, summary judgment is appropriate as to the causation prong of the prima facie analysis.

### B.    Legitimate non-discriminatory reason for termination

Even assuming *arguendo* that Foley had made out a prima facie case for disability discrimination, there would be no dispute that Morgan Stanley proffered a legitimate, non-discriminatory reason for terminating Foley—namely, his violation of firm policy in removing the computer that contained trade secrets and (intentionally or not) lying about it. This legitimate, non-discriminatory reason would rebut any presumption of discrimination and require Foley to demonstrate that this reason was a pretext for disability discrimination. *See Alvarez*, 610 F.3d at 1264-65.

### C.    Pretext

To show such pretext, Foley would have to show that Morgan Stanley "more likely than not acted with a discriminatory motive" or "that its proffered reasons are not credible." *Id.* at 1265. Foley has not produced sufficient evidence to show that Morgan

15

Stanley acted with a discriminatory motive.  Thus, he would have to show that Morgan Stanley's proffered reason (his unprofessional conduct in removing the computer in violation of policy) was not credible.  To do so, Foley would have to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason[ ] for its action that a reasonable factfinder could find [it] unworthy of credence. . . .  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason." *Id.* at 1265-66 (citations omitted and alteration modified).

Foley does not address pretext in his Response, nor does he submit evidence to demonstrate that Morgan Stanley's proffered reason for termination was pretextual. Foley admits that the taking of the computer was wrongful; he admits that he violated Morgan Stanley's security policy, a policy that was and is of utmost importance to the operation of the firm.  There is no dispute that the proffered reason of theft and dishonesty regarding trade secrets "might motivate a reasonable employer" and that Foley has not met this reason "head on" and "rebut[ted]" it.  Therefore, even if Foley had met his prima facie case, summary judgment would be appropriate in Morgan Stanley's favor because Foley failed to demonstrate that Morgan Stanley's reason for termination was pretextual.

### D. Counterclaim

Plaintiff admits that Morgan Stanley loaned him $2.2 million, that Plaintiff breached the promissory note and that he owes Morgan Stanley more than $1.7 million.

16

[D.E. 122 ¶ 57-64].  Plaintiff does not dispute the validity of the Note.[5]  *Id.*  Therefore, summary judgment is GRANTED as to Morgan Stanley's breach of contract claim (Count I).  Finally, the unjust enrichment claim is dismissed with prejudice, as Plaintiff has acknowledged the validity of the underlying contract claim.

## IV. Conclusion

Morgan Stanley's Motion for Summary Judgment is GRANTED.  Summary judgment is entered on Morgan Stanley's favor on Plaintiff's counts of discrimination under the ADA and FCRA and in Morgan Stanley's favor on its count of breach of contract.

DONE AND ORDERED in Chambers in Miami, Florida, this _____ day of March, 2013.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

Copies Furnished:
Counsel of record

---

[5] Plaintiff admits that he owes the money in question but suggests that he will pay his obligation after he receives an award in this case.